OPINION
{¶ 1} Appellant, the Portage County Department of Job and Family Services ("PCDJFS"), appeals the July 7, 2003 judgment of the Juvenile Division of the Portage County Court of Common Pleas, in which the trial court denied granting permanent custody of Alexis N. Cutright ("Alexis") to appellant.
 {¶ 2} Appellee, Wendy Cutright, is the biological mother of Brianna Snow ("Brianna"), who was born on July 27, 1998, and Alexis, whose date of birth was October 31, 2001. David Snow ("Snow") is presumed to be the biological father of both girls.[1] The PCDJFS became involved in Brianna's case in August 2001.
 {¶ 3} Brianna was adjudicated a dependent on August 28, 2001, and placed in the temporary custody of the PCDJFS. Alexis was placed in the interim pre-dispositional custody of the PCDJFS on November 2, 2001. Alexis was then pronounced to be a dependent and placed in the temporary custody of the PCDJFS on January 14, 2002. On March 28, 2003, the PCDJFS filed two motions for permanent custody as to both Brianna and Alexis. On that date, Brianna had been in the temporary custody of the PCDJFS for nineteen consecutive months, and Alexis had been in the temporary custody of the PCDJFS for fifteen consecutive months.
 {¶ 4} In its motion for permanent custody, the PCDJFS submitted that appellee did not have adequate housing for the children, she had been diagnosed with a chronic personality disorder and lacked the capacity to parent preschool age children, and that Snow had no interest in having a relationship with either child. In his May 20, 2003 report, the guardian ad litem recommended that Brianna and Alexis be placed in the permanent custody of the PCDJFS.
 {¶ 5} A permanent custody hearing took place on May 30, 2003. The PCDJFS presented the testimony of a clinical psychologist, a clinical counselor, Brianna's therapist, a Town Hall counselor, Brianna's teacher, and both children's case worker.
 {¶ 6} The clinical psychologist, Timothy Kohl ("Dr. Kohl"), took the stand and related that he conducted an evaluation of appellee in December 2002. According to Dr. Kohl, the personality testing indicated that appellee "had a marked or well-defined histrionic personality disorder. This is a behavioral pattern in which the individual is very emotional, tend to be very warm very intense, but also very flighty, scattered, distractible." At the time of the evaluation, Dr. Kohl opined it would be "very unlikely [appellee] would be able to * * * adequately parent her child within the foreseeable future, within the next year, within the following year." Dr. Kohl explained that the presence of a spouse in the home to assist in parenting the children could impact his opinion regarding appellee's ability to parent her children. He further stated that appellee's intellectual functioning would not in and of itself limit her ability to parent the children.
 {¶ 7} James Vernon ("Vernon"), a clinical counselor, testified that he counseled appellee between seven and eight times from November 2001 to May 2002, and again two times in February 2003. Vernon revealed that the primary goal of his sessions with appellee was stress management. Vernon indicated that when appellee returned in 2003 for sessions, she had "developed a better sense of how to manage her own stress so that she could plan * * * for what her kids need and that was the primary [goal] for coming in." He also mentioned that he and appellee discussed what appellee needed to do in the future to be able to have her children returned to her, and Vernon's understanding was that she was taking his advice.
 {¶ 8} Brianna's therapist, Jennifer Teichman ("Teichman"), took the stand and stated that she had been involved with appellee through family counseling. Teichman began seeing Brianna individually for weekly sessions in August 2001. She started meeting with appellee in July 2002. When appellee began her sessions, she would come in every other week, and those sessions were with appellee and Brianna. Sometimes appellee's husband, Cutright, would attend those sessions. Teichman explained that the purpose of the counseling was so that Brianna would "become more comfortable around her mother. You know, attempts to * * * further establish and develop that relationship on a very basic level. And, then beyond that, * * * address any parenting concerns that are there * * *."
 {¶ 9} Appellee began unsupervised visits with Brianna in January 2003. It was Teichman's opinion that based on what she had seen in her office, appellee's interaction with Brianna and appellee's parenting ability had dramatically improved from August 2002. However, she did state that appellee "does still not fully comprehend why the children were removed from her care in the first place and in order to better parent an individual, you need to understand * * * things like why children might have been removed from your care in the first place for the simple fact that there's a risk of those behaviors being repeated again." Teichman further indicated that appellee was consistent with her therapy sessions. She also opined that a decision needed to be made soon about where Brianna was going to be permanently placed.
 {¶ 10} Linda Rolinson ("Rolinson") took the stand and stated that she worked as a counselor for Town Hall II and also did contract work for the PCDJFS. Rolinson related that she first saw Snow in 2001. She assessed Snow on April 24, 2003, and he was diagnosed with "chemical dependency alcohol." She recommended intensive outpatient treatment for him through Town Hall II. He began the program on May 28, 2003, two days before the hearing.
 {¶ 11} Janine Sudnick ("Sudnick"), Brianna's teacher of two years, proceeded to the stand and revealed that she had an opportunity to observe Brianna in the classroom. In September 2001, when Brianna first started school, Sudnick believed that Brianna was "very aloof" and "didn't have the ability to express any emotions." She described Brianna as being very manic. Brianna had stated that she wanted to die, and Sudnick noticed that whenever someone new entered the classroom, Brianna "would ask [Sudnick] if they were there for her."
 {¶ 12} Angela Wooley ("Wooley"), Brianna's and Alexis's case worker, related that Brianna had been in a family foster home since October 2, 2002. Later, Alexis moved into that home. Wooley stated that Brianna liked being a big sister to Alexis, and she noticed that even though Alexis could not talk, she enjoyed playing with Brianna.
 {¶ 13} Prior to Brianna moving into the foster home, she resided with a paternal aunt and uncle. Brianna had lived with her aunt and uncle since June of 2001, but then her aunt and uncle requested that she be moved because they could not manage her.
 {¶ 14} Wooley mentioned that appellee and Cutright were to abide by the case plan that was implemented. One of the objectives of the case plan was to obtain stable housing and adequate income. Wooley noted that appellee and Cutright lived in a two-bedroom apartment in Windham, and Cutright had maintained steady employment throughout the case. Another objective was for Cutright to complete a psychological evaluation which, at the time of the hearing, had not been completed. Further, one of the objectives in appellee's case plan was for her to complete a parenting course, which she did. Appellee was required to enroll in individual counseling, which she also did.
 {¶ 15} In November 2002, Wooley began supervising visits between appellee and Brianna. Wooley testified that from November 2002, until the date of the hearing, appellee attended fourteen out of thirty-six visits with Brianna. Appellee had visitation with Alexis through the PCDJFS, and out of one hundred ten opportunities to visit, she met with Alexis ninety-three times.
 {¶ 16} Wooley related that she received a letter from Snow dated April 17, 2003, in which he told Wooley he wanted to terminate his parental rights to both girls. Snow also stated this to Wooley on the telephone. Wooley stated that Snow had had no visits with Brianna since October 18, 2002, and he had only limited contact with Alexis since her birth.
 {¶ 17} Additionally, Wooley related that Brianna and Alexis had no significant relationship with any other relatives other than appellee. Further, neither child was old enough to express her wishes regarding permanent custody. Wooley explained that appellee had completed most, but not all, of the objectives of the case plan and that the psychological evaluation had raised some concerns. She admitted on cross-examination that prior to the PCDJFS receiving appellee's psychological evaluation, appellee was on her way to having her children returned to her. However, the trial court inquired as to when the psychological evaluation was conducted, and it was performed on November 27, 2001. It was Wooley's recommendation that the children be placed in the PCDJFS's permanent custody for purposes of adoption.
 {¶ 18} On July 7, 2003, the trial court denied the PCDJFS's motion for permanent custody. On July 14, 2003, the PCDJFS filed a motion to stay the execution of the trial court's July 7 entry. On that same date, appellant filed a notice of appeal with this court. On August 1, 2003, the trial court denied the PCDJFS's motion for stay. This court conducted a hearing on the motion for stay on August 18, 2003. In a decision dated August 26, 2003, the magistrate for this court recommended that the motion for stay of the PCDJFS be overruled. This court adopted the magistrate's decision on November 7, 2003. Appellant presents the following assignments of error for our review:
 {¶ 19} "[1.] The trial court erred in denying [appellant's] motions for permanent custody of Brianna Snow and Alexis Cutright as the clear and convincing evidence supported a finding that the children were in the temporary custody of [appellant] for twelve of a consecutive twenty-two month period and that it was in the children's best interest to be placed in the permanent custody of [appellant].
 {¶ 20} "[2.] Assuming arguendo that the trial court was required to find pursuant to R.C. 2151.414(B)(1)(a) that the children cannot be placed with either of the children's parents within a reasonable time or should not be placed with the children's parents before granting a motion for permanent custody, the trial court erred as the clear and convincing evidence supported such a finding."
 {¶ 21} Appellant's assignments of error are interrelated and will be addressed in a consolidated fashion.
 {¶ 22} Under the first assignment of error, appellant claims that the trial court erred in denying its motions for permanent custody of Brianna and Alexis because the evidence supported a finding that the children were in the PCDJFS's temporary custody for more than twelve consecutive months out of a twenty-two month period. Appellant presents three issues for review under this assignment of error. First, appellant argues that the calculation of time beginning with each child's dependency adjudication reveals that both children had been in the temporary custody of the PCDJFS for more than twelve of a consecutive twenty-two month period. Second, appellant alleges that the issue of its failure to implement an objective of Brianna's case plan and any impact on the calculation of time that Brianna was in the temporary custody of the PCDJFS is not properly before this court. Lastly, appellant posits that the record does not reflect any unilateral changes made without the trial court's approval to Alexis's case plan.
 {¶ 23} In the second assignment of error, appellant essentially contends that the trial court erred by finding that the children could be placed with either of their parents within a reasonable time since the clear and convincing evidence did not support such a finding. Under this assignment of error, appellant presents three issues for our consideration: (1) that appellee failed to provide adequate and appropriate housing; (2) that appellee's mental illness and the severity of the illness prevented her from providing adequate parental care within the next twelve months; and (3) that appellee did not continuously fail to substantially remedy the conditions that initially caused the children's placement outside of the home.
 {¶ 24} Permanent custody should be granted to a petitioning agency only where the court finds, by clear and convincing evidence, that the grant of permanent custody is in the best interests of the child; and any of the following apply: (1) the child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services, agencies, or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (2) the child is abandoned; (3) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; or (4) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999. R.C. 2151.414(B)(1)(a) through (d) and Inre Smith, 11th Dist. No. 2002-A-0098, 2003-Ohio-800, at ¶ 8. See, also, In re Simkins, 11th Dist. No. 2002-T-0173, 2003-Ohio-1884, at ¶ 15.
 {¶ 25} In the instant matter, even though both of the children may have been in the temporary custody of the PCDJFS for more than twelve of a consecutive twenty-two month period, that is not the only factor in determining whether to grant permanent custody. The best interest of the children must also be considered.
 {¶ 26} If the juvenile court decides that one of the four circumstances in R.C. 2151.414(B)(1)(a) through (d) is present, then the court continues with an analysis of the child's best interest. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) requires that the trial court consider all relevant factors, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factor in R.C. 2151.414(E)(7) to (11) is applicable. Smith, supra, at ¶ 10. See, also, In re Litz
(Nov. 9, 2001), 11th Dist. No. 2001-G-2367, 2001 WL 1402653, at 4.
 {¶ 27} The trial court may terminate the rights of a natural parent and grant custody of the child to the moving party only if it finds by clear and convincing evidence that one of the four factors in R.C. 2151.414(B)(1)(a) applies and that it is not in the best interest of the child to be placed with the natural parent. Clear and convincing evidence is more than a mere preponderance of evidence; instead, it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. In reAdoption of Holcomb (1985), 18 Ohio St.3d 361, 368; Cross v.Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 28} It is axiomatic that both the best interest determination and the decision that the child cannot be placed with either parent focus on the child, not the parent. Miller v.Miller (1988), 37 Ohio St.3d 71, 75. A trial court cannot consider the effect that granting permanent custody will have on the parent of the child. R.C. 2151.414(C). In reviewing a trial court's determination, an appellate court may not reverse the decision unless there is a showing of an abuse of discretion.Miller at 74. An abuse of discretion connotes more than an error of law or judgment, it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219. An appellate court must consider that "`[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record.'"Reynolds v. Goll (1996), 75 Ohio St.3d 121, 124. Thus, the lower court is in the best position to weight the evidence and assess the credibility of the witnesses. Holcomb,18 Ohio St.3d at 367.
 {¶ 29} Even though the children had been in the temporary custody of the PCDJFS for more than twelve of a consecutive twenty-two month period, the evidence showed that appellee had made enough progress with her case plan to justify the court's decision that reunification could be a realistic possibility. Dr. Kohl, appellee's clinical psychologist, opined that although it would be unlikely for appellee to adequately parent her children within the foreseeable future, the presence of a spouse in the home to assist in parenting the children could impact his opinion regarding appellee's ability to parent her children. He further stated that appellee's intellectual functioning would not alone limit her parenting abilities.
 {¶ 30} Additionally, Vernon, appellee's clinical counselor, testified that he counseled appellee in 2001, and again in 2003. His opinion was that appellee had developed a better sense of how to manage her stress so that she could plan for what her children need. Vernon believed appellee was taking his advice regarding what she needed to do in the future to have her children returned to her. Also, Teichman, Brianna's therapist, revealed that appellee and Cutright attended sessions with Brianna and based on what she had seen in her office, appellee's interaction with Brianna and appellee's parenting ability had dramatically improved from August 2002.
 {¶ 31} Likewise, even though the PCDJFS presented evidence that appellee suffered from some psychological disorder that may have made it difficult for her to properly function as a parent, and although she may have missed some visitations, the evidence presented at the hearing demonstrated that the children retained a positive relationship with her. Appellee had made strides toward becoming a better parent. She had completed most of her case plan, including completing a parenting class and securing suitable housing. Cutright and appellee were living in a two-bedroom apartment, and Cutright had steady employment. Appellee enrolled in and attended counseling sessions. In fact, Wooley conceded that appellee was on her way to having her children returned to her barring the psychological examination that was taken in November 2001. The evidence further revealed that appellee had taken steps to remedy the conditions that caused Brianna and Alexis to be removed. Therefore, although the children seemed to be adjusting well to their foster parents, it seemed that the court made a sensible decision by deciding to return the girls to their mother.
 {¶ 32} Furthermore, the PCDJFS has failed to show that giving permanent custody to the PCDJFS would be in the best interest of the children. Appellee and the children demonstrated a bond. As previously mentioned, appellee complied with her case plan and appeared to be in a position to provide for her children's basic and medical needs.
 {¶ 33} Moreover, Cutright, who is a party in this case and is considered the legal father of Alexis, has substantially complied with his case plan objectives. He completed all of the objectives except for the psychological evaluation, but there was no evidence presented that he was not willing to undergo the evaluation. He visited with Alexis since her birth, maintained steady employment and obtained suitable housing. He had attended Brianna's sessions with Teichman. Cutright also completed the parenting class and genetic testing. In addition, there was no testimony that Cutright had ever done anything to either of the children to lead appellant to believe that he was not a suitable parent. Therefore, as far as Alexis is concerned, Cutright should remain the presumed father of her. As a result, he should retain co-custody of Alexis with appellee.
 {¶ 34} Despite the guardian ad litem's report and the recommendation of Wooley, we conclude that there was sufficient evidence presented to support the trial court's decision to not grant the PCDJFS's motion for permanent custody. Hence, it is our view that the trial court did not abuse its discretion. It is also our position that it was in the best interest of the children for the trial court to deny the permanent custody motion of the PCDJFS.
 {¶ 35} For the foregoing reasons, appellant's assignments of error are not well-taken. The judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
Christley and O'Neill, JJ., concur.
[1] We note that initially William Cutright ("Cutright") was presumed to be the father of Alexis since she was born while her mother, appellee, was wed to Cutright. However, a paternity test revealed that Snow was Alexis's biological father, and Cutright was not removed from the pleadings because the PCDJFS took no action to establish formal paternity as it relates to Snow nor has paternity been established by any administrative or court order.